IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SPALDING AUTOMOTIVE, INC. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 04-5975 |
| U.A.W. LOCAL 1612 | : | |

**SURRICK, J.**                                                             **MAY 31, 2006**

### MEMORANDUM & ORDER

Presently before the Court are Plaintiff Spalding Automotive, Inc.'s Motion For Summary Judgment (Doc. No. 10) and Defendant U.A.W. Local 1612's Motion For Summary Judgment (Doc. No. 11). For the following reasons, Plaintiff's Motion will be denied and Defendant's Motion will be granted.

### I.     BACKGROUND

The facts here are entirely undisputed and are fully set forth in the Arbitration Award at the core of this dispute. (Stipulated Rec. at Ex. 1.) Plaintiff Spalding Automotive, Inc. manufactures automotive parts for original equipment manufacturers, such as General Motors. (*Id.* at 4.) Defendant is a labor organization which represents the production and maintenance employees at Plaintiff's plant in Bensalem, Pennsylvania. (*Id.*) The parties formerly operated under a contract known as the "December 1, 1995 to November 30, 2000 Collective Bargaining Agreement." Under this Agreement, Plaintiff established a 401(k) plan for its employees. Participants were entitled to contribute up to 10% of their total salary to this plan. In addition, Plaintiff agreed to match participating employees' contributions, initially at a rate of 10% and then at a rate of 20% beginning December 1, 1997.[1] (*Id.* at 4-5.)

---

[1] That Collective Bargaining Agreement contained the following clauses:

In 2000, the parties commenced negotiations for a new Collective Bargaining Agreement ("CBA"), which would be in effect from December 1, 2000 to November 30, 2005. During negotiations, the issues discussed included changes to the 401(k) plan, including measures to increase employee participation. (*Id.* at 5.) Defendant speculated that participation might increase if Plaintiff agreed to raise the rate at which it matched contributions (the "matching rate"). In its initial list of written proposals, Defendant recommended that the matching rate be increased from 20% to 50% of employee contributions. (*Id.*)

As negotiations continued, the parties narrowed their differences to a few major issues, among them the 401(k) plan. At some point, Defendant rejected a proposal that would have substantially reduced the rate at which Plaintiff made matching contributions to the plan. Later, Wes Keuhnle, the COO and chief negotiator for Plaintiff, proposed that Plaintiff's matching contribution be equal to "50% percent [sic] of the first five percent (5%) of the employee's contribution." (*Id.* at 6, 7; Stipulated Rec., Ex. 2 at 33.) This proposal, combined with a substantial wage increase and more extensive health insurance coverage, was adopted by the parties in the final economic package and became part of the new CBA.

In the years 2001 and 2002, Plaintiff calculated its match to the 401(k) plan by multiplying each employee's contribution by 5% and then by 50%, so that Plaintiff's effective matching rate equaled 2.5%. (Stipulated Rec. at Ex. 1, p. 6.) During the summer of 2003,

---

> The Company shall match 10 percent of the employee's contribution, effective December 1, 1996.
> . . .
> The Company's matching contribution shall be increased to 20 percent of the employee's contribution, effective December 1, 1997.

(Stipulated Rec. at Ex. 1, pp. 4-5.)

employee Leonard Wierman complained to Kuehnle that Plaintiff was not properly calculating its matching contribution to Wierman's account.  Eventually, Wierman brought his complaint to the attention of Michael P. Glenning, the Union's President.  (*Id.* at 7.)  On August 13, 2003, Glenning submitted a grievance letter to Kuehnle, in which he complained that "the employer matching contribution has been under funded."  (Stipulated Rec. at Ex. 5.)  In a second letter, sent October 10, 2003 by Vice-President Anthony DiClementi, the Union explained that it understood the terms of the CBA to require Plaintiff to match 401(K) contributions at a rate of 50%, but that contributions in excess of 5% of an employee's yearly salary were not eligible for matching.[2]  (Stipulated Rec. at Ex. 8.)  Defendant argued that Plaintiff should have contributed $25,974.32 to the 401(k) plan during 2002, while actual matching contributions that year amounted to only $2,060.23.  (*Id.*)

As per the terms of the CBA, the grievance was eventually submitted to arbitration for a final and binding decision.  (Stipulated Rec. at Ex. 2, p. 10.)  The arbitrator, Lawrence S. Coburn, issued an Opinion and Award on December 3, 2004.  (Stipulated Rec. at Ex. 1.)  Coburn reviewed Article 38 of the CBA, which reads, in pertinent part:

> Section 4.
> Employees shall be entitled to contribute up to 10 percent of their total salary into the 401(k) plan.

---

[2] Defendant's interpretation, while not entirely obvious from the text of this letter, can be inferred based on the calculations attached by DiClementi.  (Stipulated Rec. at Ex. 8.)  In particular, DiClementi's hypothetical examples did not address the situation where the employee's contribution exceeds 5% of his total salary.  Based on the attached calculations, however, it is clear that Defendant agrees that contributions in excess of the "first 5%" of salary were be eligible for matching.  (*Id.*)

>   Section 5.
>   The Company shall match 50% percent [sic] of the first five percent (5%) of the employee's contribution, effective December 1, 2001.

(Stipulated Rec. at Ex. 2, p. 33.) He concluded the language in Section 5 was "not so clear." If a decreased matching rate were actually intended, Coburn questioned the ambiguity arising from the CBA's failure to clearly announce this impending decrease, as well as its statement of the purported new rate as the product of two percentages, rather than as a single figure.[3] He also pointed to the inclusion of the word "first" in Section 5, which would be superfluous under Plaintiff's interpretation. (*Id.* at 14.) Upon comparison to clauses in the preceding Agreement, Coburn found limited validity in Plaintiff's proposed interpretation. According to Coburn:

>   [I]f the Company intended the ambiguous language of Article 38, Section 5 to constitute such a drastic reduction in its matching contribution (from 20% to 2.5%), it was required to do either of two things: (1) make it clear by so stating in plain language; or (2) explain its interpretation of the ambiguous language across the table.

(*Id.* at 15.) Plaintiff had done neither. As such, "the wording, context and bargaining history of Section 5 compel[led] the conclusion that the Company is required to pay into each employee's Plan account 50% of the first 5% of gross wages contributed[.]" (*Id.* at 13.) Plaintiff was required to make the plan whole for the years 2001, 2002, and 2003 by recalculating its contribution based on this formula. (*Id.* at 18.)

On December 22, 2004, Plaintiff filed a Complaint in this Court, seeking to vacate Coburn's Arbitration Award. Defendant subsequently filed a counterclaim for enforcement of

---

[3] Coburn suggests that the Agreement could have simply stated that "matching contribution shall be decreased to 2.5% of the employee's contribution, effective December 1, 2001." (Ex. 1 at 13-14.)

4

the Arbitration Award. (Doc. No. 4 at 5-7.) Currently before us are the parties' cross-motions for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. LEGAL ANALYSIS

It is well settled that the scope of judicial review of arbitration awards under collective bargaining agreements is both highly deferential and extremely limited. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *W.R. Grace & Co. v. Local 259, Int'l Union of the United Rubber Workers*, 461 U.S. 757, 764 (1983); *Stroehmann Bakeries, Inc. v. Local 776, Int'l Brotherhood of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992). Where a collective bargaining agreement includes an arbitration clause, "it is assumed that the parties

bargained for a grievance resolution procedure in which an arbitrator would interpret the agreement," rather than a court sitting in judgment.  *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005).  Unfettered judicial review risks invalidating this bargain while also undermining the federal "objective of settling labor disputes by arbitrators expert in industrial practices and customs."  *Stroehmann Bakeries*, 969 F.2d at 1441 (citing *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)).

As a result, we must enforce an arbitration award as long as it "draws its essence from the collective bargaining agreement," meaning the award's "interpretation can *in any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention."  *Enterprise Wheel*, 363 U.S. at 597, *quoted in News Am. Publ'ns, Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990); *Brentwood Med. Assocs.*, 396 F.3d at 241.  Moreover, "[a] court may not overrule an arbitrator simply because it disagrees with the arbitrator's construction of the contract, or because it believes its interpretation of the contract is better than that of an arbitrator."  *News Am. Publ'ns*, 918 F.2d at 24 (internal citations omitted).  Rather, "[a]s long as the arbitrator has *arguably* construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that [the] arbitrator has committed a serious error."  *Id.*  "Only where there is a 'manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.'"  *Id.* (quoting *NF&M Corp. v. United Steelworkers of Am.*, 524 F.2d 756, 759 (3d Cir. 1975) (internal quotations omitted)); *see also Exxon Shipping v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993).

In this case, Plaintiff contends that the relevant provisions of the CBA unequivocally establish a 2.5% matching rate.  (Doc. No. 10 at 10.)  According to Plaintiff, the language in Article 38, Section 5 of the CBA is "plain and unambiguous" and thus no room exists for its interpretation or construction.  (Doc. No. 10 at 11 (citing Williston*, Interpretation and Construction of Contracts* § 30:4 at 37).)  Plaintiff argues that Coburn's decision to construe the clause in favor of Defendant therefore represents a manifest disregard of Article 5, Section 11 of the CBA.  (Doc. No. 10 at 10.)  Section 11 provides that "[t]he arbitrator shall have no authority to add to, subtract from, modify or change any of the terms of this Agreement."  (Stipulated Rec. at Ex. 2, p. 10.)

Under Pennsylvania law "[a] contract is ambiguous if it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning."  *Beta Spawn, Inc. v. FFE Transp. Servs.*, 250 F.3d 218, 227 (3d Cir. 2001); *see also Diamond v. Lundy*, 177 F. Supp. 2d 371, 378 (E.D. Pa. 2001), *aff'd sub nom. Lundy v. Hochberg*, 79 Fed. App'x 503 (3d Cir. 2003).  Plaintiff is correct that a finding of ambiguity in a contract must be made on "an objective basis."  (Doc. No. 10 at 11 (quoting Williston § 30:4 at 51-54).)  However, while Plaintiff focuses on the confined wording of Section 5, this determination actually requires one to look beyond the "detached section of the contract" under review.  *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1130 n.31 (3d Cir. 1969).  Other considerations include:  "(1) the surrounding circumstances, prior to negotiations, all relevant incidents bearing on the intent of the parties; (2) who prepared the instrument; (3) the relative bargaining position of the parties; (4) the doctrine of practical construction; and (5) the main

purpose of the contract." *Id.* (citing Williston § 600A); *see also Diamond*, 177 F. Supp. 2d at 378 ("A party may introduce extrinsic evidence to show that a provision of the contract is ambiguous, but that evidence must show 'the parties' linguistic reference,' not merely the parties' subjective expectations.").

In this case, Coburn reviewed the CBA based on Plaintiff's proffered interpretation. He looked at Article 38, Section 4, the immediately preceding clause, which permits contributions up to 10% of an employee's total salary, as well as the previous CBA, which enunciated the matching rate as a single percentage. He also considered Sections 4 and 5 of the current CBA in light of the "bargaining that preceded the final language proposed" by Plaintiff, particularly the rejection of a proposal to increase the matching rate to a flat 50% without any cap. (Stipulated Rec. at Ex. 1, p. 14.) Based on these permissible considerations, Coburn concluded that the language of the CBA was indeed ambiguous.

Upon finding Section 5 ambiguous, Coburn was faced with ascertaining its proper interpretation. A contract's construction must be sensible, *Operative Bricklayer's Union No. 64 v. Bricklayer's Local Union No. 1*, 45 F.R.D. 429, 431 (E.D. Pa. 1968), and must result in a meaning which "a reasonably intelligent person would accord it." *Crispin Co. v. Del. Steel Co.*, 283 F. Supp. 574, 576 (E.D. Pa. 1968). The most important step in arriving at the appropriate construction is a "determination of the real intention of the parties." *Ludwig Honold Mfg.*, 405 F.2d at 1131. Here, Coburn determined that the presence of the word "first" in Section 5, when viewed together with Section 4, supported Defendant's interpretation of the CBA. Coburn determined that the phrase "'first' five percent is juxtaposed against the full 10% of salary that an employee may contribute into the plan. When Sections 4 and 5 are read together, it becomes

clear that just as the 10% is a percentage of total salary, the 'first' five percent also refers to a percentage of total salary." (Stipulated Rec. at Ex. 1, p. 14.)  This reading certainly makes sense. Coburn properly found that this reading explained both the use of the word "first" and the otherwise awkward language of Section 5.  Moreover, this interpretation was understandable in light of Defendant's desire to increase the matching rate to 50% and Plaintiff's reluctance to accept that proposal.  Under Defendant's version, the matching rate is increased to 50%, but matching contributions are capped in that they are not applied to employee contributions in excess of 5% of an employee's salary.  In addition, Coburn ultimately concluded that "the language, 'the first five percent (5%) of the employee's contribution,' is not an unreasonable contraction of 'the first five percent (5%) of salary contributed by the employee.'  In fact, because of the presence of the word 'first,' this interpretation is the only reasonable interpretation of the language."  (Stipulated Rec. at Ex. 1, p. 15.)

Plaintiff claims that this Arbitration Award lacks a rational basis.  (Doc. No. 10 at 14.) Plaintiff agrees that the phrase "the first five percent (5%) of the employee's contribution" is a reasonable contraction of the phrase "the first five percent (5%) of salary contributed by the employee," but argues that both are equivalent to five percent of the amount contributed from the employee's salary.  As such, Plaintiff avers that the Award in favor of Defendant is irrational. Put simply, two interpretations exist:  the 50% matching rate applies to either (1) 5% of salary or

9

(2) 5% of contributions.[4]  Plaintiff, of course, favors the latter.  Although the Opinion may have been more clearly phrased, this dispute involves the parsing of close contractual language, and the Award certainly cannot be said to lack a rational basis.[5]  Given the context of the Opinion, it is evident that in writing "first five percent (5%) of salary contributed by the employee," Coburn was referring to the first interpretation—5% of the employee's salary.  Plaintiff's argument is without merit.

We are satisfied that Coburn's Opinion and Award is well-reasoned and in accordance with basic legal principles of contract interpretation.  In performing his review of the disputed contract language, it cannot be said Coburn demonstrated "manifest disregard of the agreement" or that his finding of ambiguity was "totally unsupported by principles of contract construction and the law of the shop."  *See NF&M Corp.*, 524 F.2d at 759.  It is clear that this Award is, in some rational way, derived from the CBA that governed the parties' relationship.  *See*

---

[4] Calculation of Possible 401(K) Matching Contributions:

| Year | 20% Match (prior CBA) | 50% Match (Union's negotiation proposal) | Company's Proposed Interpretation (2.5% Match) | Union's Proposed Interpretation (50% Rate; First 5% of Salary) |
|---|---|---|---|---|
| 2001 | $ 15,444.32 | $ 38,610.80 | $ 1,930.45 | $ 24,328.87 |
| 2002 | $ 16,481.85 | $ 41,204.64 | $ 2,060.23 | $ 25,974.32 |
| 2003 | $ 14,297.67 | $ 35,744.17 | $ 1,787.21 | $ 23,171.78 |
| Total | $ 46,223.84 | $ 115,559.61 | $ 5,777.89 | $ 73,474.97 |

(Raw data from Stipulated Rec. at Exs. 13-15.)

[5] We also note that "ambiguity in an opinion accompanying an award is not a reason for determining that an award is unenforceable as beyond the scope of the arbitrator's authority." *UPS, Inc. v. Int'l Brotherhood of Teamsters*, 55 F.3d 138, 141 (3d Cir. 1995).

*Brentwood Med. Assocs.*, 396 F.3d at 241.  In order to avoid future confusion, and litigation, the parties would be advised to more carefully draft their next collective bargaining agreement. Nonetheless, vacatur of Arbitrator Coburn's Opinion and Award is not appropriate at this juncture.

     Accordingly, Plaintiff's Motion will be denied and Defendant's Motion will be granted. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SPALDING AUTOMOTIVE, INC. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 04-5975 |
| U.A.W. LOCAL 1612 | : | |

**MEMORANDUM & ORDER**

AND NOW, this 31st day of May, 2006, upon consideration of Plaintiff's Motion For Summary Judgment (Doc. No. 10) and Defendant's Motion For Summary Judgment (Doc. No. 11), it is ORDERED that Plaintiff's Motion is DENIED and Defendant's Motion is GRANTED. Plaintiff is directed to comply with the terms of the Opinion and Award entered December 3, 2004 by Arbitrator Lawrence S. Coburn, AAA Case No. 14 300 00870 04.

IT IS SO ORDERED.

BY THE COURT:

/s R. Barclay Surrick
_____
R. Barclay Surrick, Judge